RUSSELL, J.,
dissenting:
¶ 25. The MDES claims examiner, the administrative law judge (ALJ), ■ the MDES Board of Review, and the circuit court all determined that Seaman was entitled to unemployment benefits because her employer failed to prove that she did not work the hours submitted or that she falsified her work hours. The majority reverses the circuit court’s decision, finding that the decision was not supported by substantial evidence and that it was arbitrary and capricious. I disagree. I believe the decision is supported by substantial evidence and is not arbitrary and capricious; therefore, I would affirm.
¶ 26. “The restricted standard of review for administrative appeals is well established.” Nevels v. Miss. Dep’t Emp’t Sec., 39 So.3d 995, 997 (¶ 9) (Miss.Ct.App.2010) (emphasis added). “Absent any fraud, this Court and the circuit court are bound by the Board [of Reviewj’s findings of fact, assuming there is substantial evidence supporting such.” Id. (citing Miss. Emp’t Sec. Comm’n v. PDN, Inc., 586 So.2d 838, 840 (Miss.1991)). “The conclusions of an administrative agency will remain undisturbed unless the agency’s order is: (1) not supported by the evidence, (2) arbitrary or capricious, (3) beyond the scope or power granted to the agency, or (4) in violation of the complaining party’s statutory or constitutional rights.” Id. (citing Miss. Dep’t of Emp’t Sec. v. Good Samaritan Pers. Servs., 996 So.2d 809, 812 (¶ 6) (Miss.Ct.App.2008)). “On appeal, a rebut-table presumption exists in favor of the administrative agency, and the challenging party has the burden of proving otherwise.” Id.
¶ 27. The issue on appeal is whether there is substantial evidence to support the MDES’s decision that Seaman was not guilty of misconduct or whether the decision was arbitrary and capricious. In this case, the claims examiner found that the employer failed to prove that Seaman was discharged for misconduct. Therefore, it awarded benefits. The employer appealed to the ALJ, who also found that the employer failed to prove misconduct. The ALJ found that the employer’s case was based on speculation and affirmed the decision of the claims examiner awarding Seaman benefits. The ALJ entered findings of fact and conclusions of law, which stated, in relevant part, as follows:
[Seaman] worked directly for the county government of Jackson County from October 2, 2000, until August 27, 2009. She worked full-time as an [ajdministra-tive [ajssistant at the County Civic Center under Jim Hart, who is director of the Jackson [Fairgrounds]. [Seaman] also worked for the Jackson Fair Association, which is a quasi-governmental body associated with the county. [Seaman] reported the pay excepted for her time worked for the Fair Association on her time card she turned in to the Civic Center. Eddie Russell, [president of the Fair Association, usually signed off on the hours she worked for the Fair Association. Jim Hart usually sign[ed] off on the hours she worked for the Civic Center.
Human Resources became suspicious of the number of hours [Seaman] reported as worked for the Fair Association. At first[,] the county took no action. In late 2008, the county hired a private investigator to follow [Seaman] to see if her hours were being recorded accurately. The investigator noted some possible discrepancies but did not reach a firm conclusion that she had falsified her hours worked.
On July 21, 2009, [Seaman] was called by Janet Krebs, [director of [hjuman [resources. Ms. Krebs questioned [Seaman] regarding signatures on her *205 time sheets. [Seaman] denied that she had falsified the signatures on the time sheet handed to her. Ms. Krebs suspended [Seaman] on July 21, 2009, with pay, to conduct an investigation. [Seaman] was terminated by the county on August 27, 2009.
The employer’s attorney called several witnesses in this case.
The first was Beli [Lamey], a payroll clerk for the County. Ms. [Lamey] testified as to the format of [Seaman’s] time sheets and whether there were any inconsistencies. She stated that [Seaman] regularly turned in time sheets totaling about 80 hours worked over the two weeks.
The second witness was Alan Smith, [d]irector of the Jackson Fair Board. He testified as to what [Seaman’s] duties to the Fair Board entailed, and that he did not believe that [Seaman] could have actually work[ed] 30-40 hours a week to set up a week long annual fair. The [ALJ] notes that he, himself, has not actually performed [Seaman’s] job duties. [Seaman] seems to have done the bulk of the coordinating for the annual fall fair for well over a decade. It seems to the ALJ that she would be the best witness to what her duties would entail, whereas Mr. Smith’s testimony is mostly speculative. It is possible [Seaman] is set in her ways and did not use technology effective[ly][or] efficiently in her duties. Inefficiency is a very different matter from purposely turning in falsified time sheets.
The third witness was Mr. John Hart, [d]irector of the [f]air[g]rounds. He testified that some of [Seaman’s] duties to the Civic Center and the Fair Board overlapped and that she had been hired with the understanding that she could complete tasks for the Fair Board in her extra time in his employ. However, [Seaman] testified that her duties solely for him regularly came to 40 hours a week, and therefore, she did not have time to complete tasks for the Fair Board.
Finally, the last employer witness was Janet Krebs, [d]irector of [h]uman [resources. She testified that there had been an investigation by handwriting experts of the signatures on [Seaman’s] time cards, and not all of the cards had been signed by Mr. Hart or Mr. Russell. The employer did not submit a copy of the handwriting analysis. [Seaman] also testified that she sometimes signed her time cards when her supervisors were not available at the right time, but she had always done so with permission, and she had never submitted hours without their knowledge.
The employer also submitted documentary evidence of many time cards going back over a year of employment. The [ALJ] [finds] that they are very consistent in the hours submitted. However, the [ALJ] finds this to be circumstantial evidence of wrong[-]doing at [best]. Consistent hours may also be indicative of someone who is methodical and knows how long tasks will take. Again, [Seaman] seems to have submitted similar hours worked for many years. The County even had a private investigator follow [Seaman] during the winter of 2008-2009 to observe [Seaman’s] hours. The results of the investigation were submitted by both sides. The private investigator concluded that the investigation did not reveal substantial evidence of fraudulent time[ ]keeping on [Seaman’s] part.
The ALJ concludes that the County’s case is mostly based on speculation as to whether her work for the [fair] truly took as much time as she submitted. *206 That is not enough to be substantial evidence of wrong[-]doing. There is also the dispute as to whether her supervisor always actually signed her time sheets, or whether they allowed her to sign in their place sometimes. The ALJ notes that the time sheets are so consistent, the number of hours she submitted could have hardly come to a surprise to her supervisors. [Seaman] clearly and consistently testified that she believed she had been submitting] her time sheets properly.
[Seaman] may have been inefficient, and the County is certainly [within] its rights to find someone who can perform duties in less time.
(Emphasis added).
¶ 28. After the ALJ entered her opinion, the employer appealed to the Board of Review, which affirmed and adopted the ALJ’s findings of fact and conclusions of law. Thereafter, the employer appealed to the circuit court, which affirmed the decision of the Board of Review awarding benefits. The circuit court’s order reads in relevant part:
The [c]ourt has now reviewed eighty [pages of time sheets] and finds that without some explanation as to how they alone meet the burden of proof required to meet the charges of ‘stealing, embezzlement, dishonesty, falsification of records[,] or willful misrepresentation of facts[,]’ these time sheets speak for themselves since some are signed by her supervisors and not disputed as to their accuracy, except curious suspicion that nobody is so dedicated as to work nearly eighty hours a week In this case[,] an investigator was hired to follow [Seaman] but found nothing to refute her statement. It could be said that she needed the money and ... was holding down two (2) jobs[,] and the time sheets indicate the time to be for a combination of two (2) jobs.
[Seaman] gives a first hand description of job duties and an acceptable explanation of her time sheets before being somewhat cut off by the ALJ[.]
The [c]ourt has carefully reviewed the case history[,] including the findings of fact and conclusions of law made by the [ALJ], after a full hearing on the record, and finds that the decision was and is supported by credible evidence. A fair and reasonable interpretation of the direct testimony[] evidences that [Seaman] was a valued and trusted employee. She worked without a great deal of supervision and for a long period of time [she] performed her various duties at home long after normal work hours. She was allowed to keep her own time and although her supervisor denied that the signature on her time sheet was his signature, he did not dispute that he had on occasions allowed her to sign his name to documents. [Seaman] denied that she falsified any records of her time worked and admitted that on occasions she would sign her supervisor[’]s name but[ ] only[] when authorized to do so. Although suspicious circumstances may have arisen in the minds of some to cause a private investigator to be hired to surreptitiously follow [Seaman] and gather any information to prove her dishonesty[,] the result of the investigation revealed only possible discrepancies but no conclusion that she had falsified hours worked.
The [e]ourt finds, as did the ALJ, that the Countfy’s] case is based upon surmise speculation and conjecture that Seaman[’]s work duties did not require as much time as she submitted. Such basis is never sufficient to establish a required element of wrong[ ]doing or *207 fraudulent timekeeping - on the claimant[’]s part.
(Emphasis added).
¶ 29. After the circuit court affirmed, the employer appealed to this Court. After four different entities determined that Seaman’s employer failed to prove misconduct, the majority decides that they all got it wrong. I agree with the claims examiner, the ALJ, the Board of Review, and the circuit court that the employer failed to prove misconduct. The employer’s case was based on speculation at best. As already noted, Seaman did not have to prove anything; instead, the employer had the duty to prove Seaman’s misconduct by substantial evidence. See Miss. Dep’t Emp’t Sec. v. Clark, 13 So.3d 866, 872 (¶ 15) (Miss.Ct.App.2009) (noting that it is “the employer that [bears] the burden of showing that the employee’s conduct warranted disqualification from eligibility for benefits by substantial, clear and convincing evidence”). The employer simply failed to prove that Seaman did not work the hours she submitted on her time sheets. Further, the hours Seaman submitted were not unreasonable. Working two jobs, totaling sixty to eighty hours each week, is not an impossible task. Moreover, neither Smith nor Hart ever worked as a member of the Fair Association; therefore, they would not have personal knowledge as to what Seaman’s fair duties were or how many hours it would take to perform these duties.
¶ 30. I also note that Seaman’s supervisor, Eddie Russell, did not testify at the telephonic hearing before the ALJ. If anyone would know what Seaman’s fair duties entailed or the hours she worked, it would have been Russell. Russell never testified that Seaman improperly signed his name on Seaman’s time sheets or that he did not give her permission to sign his name. Such an allegation was merely speculation on the employer’s part..
¶ 31. Further, the private investigator hired by the agency did not find any misconduct. Surely, if Seaman was falsifying her work hours, the private investigator would have discovered such misconduct after following Seaman in 2008. Finally, the handwriting expert’s findings were never admitted as an exhibit even though Lamey testified that it was these findings that ultimately led to Seaman’s termination. In sum, Seaman’s employer failed to prove that Seaman was guilty of misconduct rendering her ineligible to receive unemployment benefits. While there may be some evidence to suggest misconduct by Seaman, there is also substantial evidence that she was not guilty of misconduct. While the majority might have found differently, this Court “cannot substitute its judgment for that of the agency or reweigh the facts of the case.” CLC of Biloxi, LLC v. Miss. Dep’t of Health, 91 So.3d 633, 635 (¶ 6) (Miss.2012).
¶ 32. For the above reasons, I would find that the Board of Review’s decision was supported by substantial evidence and was not arbitrary and capricious. Therefore, I would affirm the judgment of the circuit court, which affirmed the Board of Review’s decision to grant Seaman unemployment benefits.
IRVING AND GRIFFIS, P.JJ., AND FAIR, J„ JOIN THIS OPINION.